IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| RUTH B.[1], ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Civil Action No. 7:20cv00457 |
| ) | |
| KILOLO KIJAKAZI[2], ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

Plaintiff Ruth B. ("Ruth") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Ruth alleges that the Administrative Law Judge ("ALJ") erred by: (1) finding that she had no medically determinable cognitive impairment; and (2) concluding that she could perform her past relevant work.

I agree that the ALJ's decision is not supported by substantial evidence, as the ALJ failed to adequately explain her finding that Ruth had no medically determinable cognitive impairment. Accordingly, I **RECOMMEND GRANTING in part** Ruth's Motion for Summary Judgment (Dkt. No. 16), **DENYING** the Commissioner's Motion for Summary Judgment (Dkt. No. 19), and **REMANDING** this matter for further administrative consideration.

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is hereby substituted for Andrew Saul as the defendant in this case.

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Ruth failed to demonstrate that she was disabled under the Act.[3] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

However, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

necessary" because the court is "left to guess [at] how the ALJ arrived at his conclusions"); see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion") (citation omitted).

## CLAIM HISTORY

Ruth filed for DIB in April 2018, claiming that her disability began on March 26, 2017, due to spine and wrist problems and neck mobility. R. 157, 204, 212. Ruth's date last insured is June 30, 2022; thus, she must show that her disability began on or before this date and existed for twelve continuous months to receive DIB.[4] R. 16, 212; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied Ruth's application at the initial and reconsideration levels of administrative review. R. 64–72, 75–87. On July 22, 2019, ALJ Lisa B. Parrish held a hearing to consider Ruth's claims for DIB. R. 33–63. Counsel represented Ruth at the hearing, which included testimony from vocational expert Steve Gumerman. On August 7, 2019, the ALJ entered her decision analyzing Ruth's claims under the familiar five-step process[5] and denying her claim for benefits. R. 15–27.

The ALJ found that Ruth was insured at the time of the alleged disability onset and that she suffered from the severe impairment of degenerative disc disease of the cervical spine. R. 18. The ALJ found Ruth's alleged impairments of skin cancer, hypertension, osteoporosis,

---

[4] Ruth was 61 years old on her alleged disability onset date and 63 years old on the date of the hearing, both which are defined as an individual closely approaching retirement age. R. 25.

[5] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

hypothyroidism, and fracture of the left wrist were nonsevere impairments[6], while Ruth's alleged cognitive impairment was not a medically determinable impairment. R. 18–19. The ALJ also found that Ruth's impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 19. The ALJ specifically considered listing 1.04 (disorders of the spine). R. 19–20.

The ALJ concluded that Ruth retained the residual functional capacity ("RFC") to perform a limited range of light work. R. 20. Specifically, Ruth can never climb ladders, ropes, or scaffolds, can only occasionally climb stairs, push/pull bilaterally, and reach overhead, and can frequently perform other postural activities. Id. The ALJ determined that Ruth is capable of performing her past relevant work as a nurse sonographer. R. 25. Alternatively, the ALJ determined that Ruth had acquired work skills from her past relevant work as a sonographer that were transferable to two other occupations with jobs existing in significant numbers in the national economy, an ultrasound technician and echocardiogram technician. R. 25. Thus, the ALJ determined that Ruth was not disabled. R. 26–27. Ruth appealed the ALJ's decision and the Appeals Council denied her request for review on July 20, 2020. R. 1–4.

## **ANALYSIS**

Ruth argues that the ALJ erred in finding that she had no medically determinable cognitive impairment and in finding that she could perform her past relevant work.

---

[6] The ALJ explained that a non-severe impairment causes no more than minimal limitations in a claimant's ability to perform basic work activities and are controlled with medications or treatment, are asymptomatic, and/or did not last the required 12-month duration. R. 18.

4

### A. Medical History Overview

Ruth fell down a flight of stairs in June 2016, suffering multiple fractures including a cervical fracture at the C1 level and multiple rib fractures, as well as a large scalp laceration with arterial bleeding.[7] R. 264. Ruth required surgery as a result of the fall, undergoing a postural spinal fusion at the C1-C2 level in July 2016, approximately eight months prior to her alleged disability onset date. R.365-67. Ruth returned to work part-time in October 2016, working only four hours at a time. R. 391. At follow-up appointments, she complained of neck muscle spasms and decreased range of motion in her cervical spine. R. 423, 499. Ruth testified at the hearing that she did not have any cervical treatment from September 2016 through May 2019, stating that her doctor had released her, indicating there was nothing more he could do. R. 44. Ruth fell again in March 2018 and fractured her wrist. R. 508. She underwent surgery and physical and occupational therapy. R. 534.

Ruth was also evaluated for a cognitive impairment during the relevant period and underwent several CT scans. At the hearing Ruth testified that, while her "long-term memory is great" she has a "terrible" short-term memory. R. 47–48. She also complained of short-term memory loss during an October 2018 doctor's appointment. R. 553. A CT scan shortly after her June 2016 fall showed small volume subarachnoid, intraventricular hemorrhage, and extra axial likely subdural hemorrhage, along the left frontoparietal convexity, a large scalp laceration with hematoma, and similar ex vacuo dilation of ventricular system compared to prior imaging due to cerebral atrophy. R. 282. Ruth underwent a neurological evaluation in May 2019, where she reported poor short-term memory, daily mild headaches, and difficulty balancing, since her June

---

[7] As the ALJ noted, Ruth's fall down the stairs occurred while she was intoxicated. R. 21, 264. Her record, however, indicates she is only an occasional drinker, imbibing approximately 3–4 glasses of wine a week. R. 392.

2016 fall. R. 589. On exam she was alert and oriented, with mental math and sentence construction intact, normal language function. R. 594. While the treatment notes indicate that Ruth "does well on memory testing in clinic" the neurologist's diagnoses included "memory changes" and recommended considering neuro psych memory testing. R. 594–95. Id. Ruth had another CT scan in June 2019 which showed a chronic/mature insult, senescent change and spondylotic/discogenic postsurgical change, but no evidence of an acute intracranial process. R. 598.

### B. Cognitive Impairment

Ruth argues that the ALJ erred by failing to find that her alleged cognitive impairment was a medically determinable impairment. In support, Ruth points to her June 2019 CT scan and her testimony regarding her ongoing mental issues and hand tremors, arguing that the ALJ failed to properly consider this evidence. The Commissioner counters that the ALJ adequately supported her finding that Ruth's alleged cognitive impairment was not a medically determinable impairment "let alone a severe impairment." D.'s Br. at 7.

The ALJ determined that Ruth's alleged cognitive impairment was "not a medically determinable impairment." R. 19. The ALJ supported her conclusion that no medical evidence established the existence of a cognitive impairment by asserting that Ruth only first reported her neurological symptoms, including poor short-term memory and forgetting people's names, to a medical provider at a May 21, 2019 neurology appointment. R. 23, 589. However, this is inaccurate; an October 5, 2018 medical record from an appointment with Ruth's family doctor indicates short-term memory loss.[8] R. 553. Ruth also stated in her Function Report, completed July 2018, that she could not remember whether she had taken her medication, forgets things

---

[8] In fact, the ALJ noted in the previous paragraph that Ruth had reported short-term memory loss to her doctor at this October 2018 appointment. R. 23.

easily, has poor short-term memory, and could not pay bills because the numbers confuse her. R. 220. Ruth also testified at the hearing that while her long-term memory remains fine, her short-term memory is terrible, including issues remembering if she took her pills, remembering people, and having gaps in her memory. R. 47–48.

To support her determination, the ALJ also emphasized that on neurological examination, Ruth "had normal findings, including intact math calculations, intact recall, intact sentence construction, intact ability to follow commands, intact motor strength and sensation in her upper and lower extremities, and normal gait (including tandem) . . . and did well on memory testing in the clinic." R. 23, 597. While the treatment notes do indicate all this, they also contain a treatment plan which directed a CT scan and indicated Ruth should follow up in three months and "consider neuro psych testing for memory in the future". R. 594. Further, the diagnoses from this May 21, 2019 initial neurology office visit indicate headache disorder, poor balance, and memory changes. R. 596.

Here, there is evidence the ALJ failed to explain or consider that could support a finding that Ruth's alleged cognitive impairment was a medically determinable impairment. Under the regulations, and acknowledged by the ALJ, "a physical or mental impairment must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. §§ 404.1521, 416.921. The regulations define objective medical evidence as "signs, laboratory findings, or both." See 20 C.F.R. §§ 404.1502, 416.902. "Signs means one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." Id. "Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory,

7

orientation, development, or perception, and must also be shown by observable facts that can be medically described and evaluated." Id.

Ruth underwent a neurosurgical evaluation shortly after her June fall, reporting experiencing symptoms including headaches and hand tremor, as well as balance issues. R. 345. A CT scan taken in June 2016 showed small volume subarachnoid, intraventricular hemorrhage, an extra axial likely subdural hemorrhage, along the left frontoparietal convexity, along with ex vacuo dilation of ventricular system due to cerebral atrophy. R. 282. During a July 5, 2016 neurosurgical re-evaluation she reported continuing balance issues and worsening hand tremor, as well as "continuous mild headache." R. 357. Her initial office visit with a neurologist in May 2019 resulted in diagnoses of headache disorder, poor balance, and memory changes, as well as a plan to consider future neuro psych testing for memory. R. 596. Finally, while the CT scan from June 8, 2019 shows no acute intracranial process, it does show chronic/mature insult and senescent change. R. 598. The state agency physicians, who reviewed the record in 2018 did not have the opportunity to interpret this 2019 scan, including, as Ruth argues in her brief, how it "showed the injury from the [brain] hemorrhage as well as [change] due to an aging brain." Pl.'s Br. at 7, Dkt. 17.

These treatment notes and CT scans support Ruth's cognitive impairment or memory complaints being a medically determinable impairment, because they provide objective medical evidence from an acceptable medical source, including CT scans showing a previous brain bleed and changes due to aging, Ruth's diagnosis of memory changes, and reports over several years of short-term memory loss, persistent headaches, and hand tremors to her medical providers. The ALJ's decision did not discuss her diagnosis of memory changes nor what the CT scan meant in

8

terms of her alleged cognitive impairment; instead writing that Ruth only first complained of memory issues at her May 21, 2019 appointment, which was untrue.[9]

The Commissioner also argues that even if the ALJ erred, any error was harmless because the ALJ found a severe impairment of degenerative disc disease and proceeded to step three of the sequential evaluation process. However, because the ALJ found Ruth's alleged cognitive impairment was not a medically determinable impairment, this case must be distinguished from those where an ALJ committed harmless error by finding an impairment non-severe, but still considered the effect of the impairment in subsequent steps of the disability analysis. In short, finding an impairment either severe or non-severe, and then considering and explaining any effects in the RFC and subsequent steps, is materially different from finding no medically determinable impairment.

Here, the ALJ did not consider Ruth's alleged cognitive impairment in subsequent steps, because she found it to be "not medically determinable." R. 19. This omission cannot be harmless error because the ALJ will consider only medically determinable impairments in assessing RFC. See 20 C.F.R. §§ 404.1521, 416.921 ("After we establish that you have a medically determinable impairment(s), then we determine whether your impairment(s) is severe."); see also Oke v. Berryhill, No. CV 1:18-709-TLW-SVH, 2019 WL 1411471, at *15 (D.S.C. Jan. 17, 2019), report and recommendation adopted sub nom. Hennix-Oke v. Berryhill, No. 1:18-CV-00709-TLW, 2019 WL 1405738 (D.S.C. Mar. 28, 2019). Indeed, all the cases cited by the Commissioner deal with situations where an ALJ determined an impairment was non-severe, not non-medically determinable. See D.'s Br. at 9–10.

---

[9] Likewise, the Commissioner discounts the June 2019 CT scan by stating it was taken "two months before the end of the relevant period." D.'s Br. at 6, Dkt. 20. While the August 2019 ALJ decision does determine the relevant period here, I also note that Ruth's date last insured is not until June 2022, several years after the 2019 scan.

9

Because I find that remand is warranted on the grounds that the ALJ did not adequately explain her determination that Ruth's cognitive impairment was not a medically determinable impairment, and thus her decision is not supported by substantial evidence, Ruth's additional allegations of error will not be addressed. See Boone v. Barnhart, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (remanding on other grounds and declining to address claimant's additional arguments). However, upon remand, the Commissioner should take into consideration Ruth's remaining allegations of error.

## CONCLUSION

For the foregoing reasons, I **RECOMMEND GRANTING in part** Ruth's motion for summary judgment, **DENYING** the Commissioner's motion for summary judgment, and **REMANDING** this case for additional consideration under sentence four of 42 U.S.C. § 405(g).

The Clerk is directed to transmit the record in this case Michael F. Urbanski, Chief United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including the waiver of the right to appeal.

Entered: October 29, 2021

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge